## AMERICAN STEAM BOILER INS. CO. v. CHICAGO SUGAR REFINING CO.

(Circuit Court of Appeals, Seventh Circuit. October 13, 1892.)

### No. 34.

1. INSURANCE AGAINST EXPLOSIONS—CONSTRUCTION OF POLICY.

A steam boiler insurance company that had no power to insure against fire issued a policy insuring "against explosion and accident and against loss or damage resulting therefrom." On the back of the policy was a covenant that no claim should be made under the policy "for any loss or damage by fire resulting from any cause whatever." *Held*, that the company was not liable for loss caused by fire.

2. SAME—LOSS BY FIRE.

A small fire broke out in the insured building, and continued for three days, though apparently extinguished each day. On the third day efforts to put out the fire resulted in bringing it in contact with a cloud of starch dust, which ignited and exploded, demolishing the building, which then burned up. *Held*, that the insurance company was not liable, since the explosion was merely an incident of the fire. 48 Fed. Rep. 198, reversed.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

Action by the Chicago Sugar Refining Company against the American Steam Boiler Insurance Company upon a policy of insurance. Plaintiff obtained judgment. 48 Fed. Rep. 198. Defendant brings error. Reversed.

Statement by BUNN, District Judge.

This action is brought upon a policy of insurance issued by the plaintiff in error to the defendant in error on October 18, 1889. The loss for which indemnity was claimed under the policy involved a substantial destruction of the buildings and machinery constituting the sugar refinery of the defendant company in Chicago. On the day the policy in suit was issued the sugar refining company held two other policies in the American Steam Boiler Company, which were surrendered upon the issuing of the one in suit. The facts in the case appear mainly from a stipulation of the parties. Other evidence was taken, but the facts depend principally upon the stipulation, and are undisputed. A jury was waived, and the case tried by the court, which handed down its findings in favor of the defendant in error on November 23, 1891, assessing its damages at the sum of $44,241.09, for which sum judgment was entered.

Only the conclusions of law are reviewable in this court. The essential facts as they appear from the stipulation and from the findings of the court are as follows: The American Steam Boiler Insurance Company was incorporated November 5, 1883, under an act of the state of New York passed January 24, 1853, and certain other acts amendatory thereof. On the 18th day of October, 1889, it issued to the defendant in error, the Chicago Sugar Refining Company, a policy as follows:

### "PERFECTED BLANKET CONTRACT POLICY.

"Policy No. A15,504.
"Expires October 17, 1890.
"Location, Chicago, Ill.

#### "American Steam Boiler Insurance Company,
of New York. '

"Servimus Sevare.

"Principal Offices:

"Equitable Building, 120 Broadway, **New York.**

"Cash Capital, $500,000.00.

"Name of Assured, Chicago Sugar Refining Co.
"Amount Insured, $250,000.
"Premium, $1,250 payable upon delivery of policy, by check to order of the Company.

"Form 301.

"Agents.

"Thatcher & Voight,
"Mgrs. Western Dep't,
"Phoenix Building,
"Chicago.

"Cash Capital $500,000.00.

"No. A15,504.                                                        $250,000.

#### "American Steam Boiler Insurance Company,
of New York.

"In consideration of the application herefor, and the sum of surrender of Pols. 65,326 and 65,327 and four hundred and fifty dollars, The American Steam Boiler Insurance Company do insure Chicago Sugar Refining Co. and their legal representatives to the amount of Two Hundred and Fifty Thousand Dollars, as follows, viz:

#### "Perfected Blanket Contract No. 300.

"Approved by the Insurance Department of the State of New York, Sept. 16, 1889. Copyrighted, 1889, by The American Steam Boiler Insurance Company.

"Upon the 21 steam boilers and 34 filters, tanks, converters, etc., on the premises occupied by the assured as Sugar Refinery, situate in the City of Chicago, State of Illinois, and upon the steam pipes, the 9 engines, the shafting, belting, hangers, pulleys and the two elevators connected therewith and

operated thereby, against explosion and accident, and against loss or damage resulting therefrom, to the property, real and personal, of the assured, and to all property of other persons for which the assured may be liable.

"And against accidental personal injury and loss of human life, for which injury or loss of life the assured may be liable, to his employes or to any other persons whomsoever, and which shall be caused by said boilers or any machinery of whatever kind, connected therewith or operated thereby. "But it is understood:

"That this company shall not be liable for any loss unless amounting to One Hundred Dollars or more, except for a loss resulting from injury to person; and

"That this company's entire liability for the injury or loss of life of any one person shall in no event exceed $5,000; and

"That this is a policy of Indemnity only.

"And this policy shall only cover losses sustained by the assured as above specified, between the seventeenth day of October, eighteen hundred and eighty-nine, to the seventeenth day of October, eighteen hundred and ninety, at 12 o'clock, noon, to be paid at their offices in the City of New York, within ten days after the receipt of proof of loss has been duly verified by the assured and accepted by the company, such indemnity payment being subject to the covenants and agreements herein; and this policy is issued and accepted upon the condition that all the provisions printed upon the back of this policy are accepted by the assured as part of this contract, as fully as if they were recited at length over the signatures hereto affixed.

"In Witness Whereof, The American Steam Boiler Insurance Company, of New York, have caused these presents to be signed by their President and attested by their Secretary, in [Seal] the City of New York, but shall not be valid nor will any indorsement or agreement be binding unless countersigned by the duly authorized and regularly commissioned managers for Western Department.

"Wm. K. Lothrop, President.
"V. R. Schenck, Secretary.

"Countersigned at Chicago, Illinois, this eighteenth day of October, 1889.
"Thatcher & Voight, Managers."

On the back of the policy, among other covenants and conditions, all made a part of the policy, were the following, which are the only ones material to this case:

"(2) That at all reasonable times the inspectors of this company shall have access to said boiler or boilers, and the said engines, elevators, and machinery connected therewith, on which safety depends; and ample facilities shall be afforded, whenever requested, to said inspectors, for a thorough examination of said boilers, and for the indicating of the said engines, and for the inspection of the said elevators and machinery."

"(3) That by the term 'explosion,' as used in this policy, is to be understood a sudden and substantial rupture of the shell or flues of the boiler or boilers, caused by the action of steam, and no claim shall be made under this policy for any explosion or loss caused by the burning of the building or steamer containing the boiler or boilers, engines, elevators, or machinery, or for any loss or damage by fire resulting from any cause whatever; nor for any loss or damage which may occur during any invasion, insurrection, riot, or civil or military commotion, or by theft or robbery, or by neglect of assured to use all possible means to save and preserve the property for further loss or damage after the explosion or accident has occurred."

The following facts were found by the court in regard to the origin of the disaster:

"That on the 27th day of March, 1890, an explosion, accident, or disaster, or whatever name may properly be applied, occurred upon the premises referred to in the policy, the result of which was a substantial destruction of a portion of the machinery, boilers, engines, filters, tanks, converters, etc., described in the policy, and of the buildings in which they were contained,

and in loss of life and injury to various persons working in and about the premises, who were employes of the plaintiff."

That the facts as to the origin of the disaster and its cause are as follows:

"The premises involved were used by the plaintiff in the manufacture of starch and dextrine, and consisted of two buildings, viz. the mill house, a one-story brick building, in dimensions about twenty-five feet wide by forty feet long, and the drying house, a two-story brick building, about two hundred feet long and fifty feet wide, the latter containing two dextrine kilns, in which prepared starch was exposed to steam heat in oven-like rooms about eight feet high, eight feet in depth, and eighteen feet wide, bricked in on the sides and top and closed in front by an iron door. In these rooms or kilns were steam pipes connecting with steam boilers, by means of which the steam heat was made available in the kilns or rooms in the process of manufacturing dextrine. High temperature is necessary to the success of the process."

"That on the 25th of March, 1890, a fire was observed by the employes of the plaintiff, confined to one of the kilns above mentioned. The fire was extinguished by the workmen, by directing upon it a stream of water through a two and one-half inch hose. The next day, March 26th, a small fire was again observed and extinguished. Afterwards, on this day, an endeavor was made to clean the kiln of the charred and wet mass or crust formed by the charred starch and the water which had been thrown into the kiln on the 25th, but it was not thoroughly removed, some of the crust having been left in the kiln under the steam pipes, and especially in the back part of the kiln, where, on account of its construction, it could not be reached by the boy who was sent in to clean it out. On the 27th it was again charged with fresh starch. Late in the afternoon of this day the foreman of the dextrine works reported to Dr. Behr, the superintendent of the plaintiff, that a blaze was observed in the same kiln where the flames had appeared on the 25th and 26th. Dr. Behr provided himself with a Babcock extinguisher, and, the door of the kiln being open, endeavored to put out the flames by directing upon it the contents of the extinguisher. He at first succeeded, but the flames immediately developed further back in the kiln, and in his endeavors to extinguish that the stream from the extinguisher came in contact with the starch, thereby producing a cloud of starch dust, similar to what is known as mill dust, which coming in contact with the flames, ignited, and produced an explosion. Through the open door of the kiln, in front of which Dr. Behr was standing, the blaze was communicated to the mill dust in the outer part of the buildings, which also ignited and exploded. Dr. Behr was thrown back by the force of the explosion, somewhat burned and injured, and for a time rendered unconscious. When he recovered consciousness he was able to free himself from the debris about him. The result of the accident or explosion or by whatever other name the fact may be designated was a substantial demolition of the two buildings above referred to, and the machinery, engines, and their connections contained in the two buildings. In addition to this, several persons in the employment of the plaintiff were killed, and others were injured in a greater or less degree."

"The blaze referred to in this finding was caused by the burning of the charred starch and crust referred to above. The blaze was a clear, bright flame, and was quite extensive, and burned strongly, being from six to eight inches high and extending under the pipes to the back of the kiln. There was no contact between the pipes and the charred starch or crust referred to. The steam pipes leading into the kiln were not defective or broken, nor was there a greater degree of heat caused by the pipes than was necessary and usual for the proper use of the kiln. The starch that was found to be blazing had been allowed to accumulate on the floor for some time, and had gradually become charred. Charred starch is combustible. The disaster was caused by the ignition of the inflammable gas or mill dust in the drying house."

Gregory, Booth & Harlan, for plaintiff in error.
John N. Jewett, for defendant in error.

Before HARLAN, Circuit Justice, and WOODS, Circuit Judge, and BUNN, District Judge.

BUNN, District Judge, after stating the facts as above reported, delivered the opinion of the court.

The circuit court found as a conclusion that the explosion was the cause of the damage, and gave judgment in favor of the plaintiff, now the defendant in error. Counsel for plaintiff in error contest this conclusion, and, in opposition to it, make two contentions:

First. That if the disaster was caused by an accident in the general sense of that term, it was not such an accident as was insured against by the policy; that the word "accident," as it occurs in the policy, is used subjectively, the same as the word "explosion," and only covers accidents in the machinery, due to its own imperfections; and that, if the damage can be said to have resulted from accident at all, it is not one resulting from any defect in the machinery, and is not therefore fairly within the purview of the policy.

Second. That the loss was properly a fire loss, and, as such, not insured against by the policy.

According to the view this court has taken of the last contention, it is not necessary to consider the first one. The insurance company issuing the policy in suit was a boiler insurance company. Their charter did not authorize them to insure against loss by fire. The law of New York under which the company was organized did not authorize nor contemplate insurance against loss by fire. The premium paid was not the premium which would have been demanded by a fire insurance company. The premium of one-half of 1 per cent. was no doubt a much smaller premium than would have been required for fire insurance, and was made commensurate with the risk taken, which, in the language of the policy, was that of "explosion and accident, and against loss or damage resulting therefrom." This being the case, the policy should not be construed as including an indemnity against loss by fire, unless such a construction becomes necessary. Certainly, a construction which would make the action of the company in issuing the policy ultra vires, should not be sought or adopted if any other reasonable construction lies close at hand, and is in accordance with the plain and obvious meaning of the language used, and the one which must have been contemplated by the parties themselves. When we look at the language of the policy, it is quite apparent that the parties not only did not contemplate or provide for such a risk, but, on the contrary, provided against it in language that is comprehensive and unmistakable. The third condition or covenant on the back of the policy contains this provision, which is a part of the contract of the parties:

"And no claim shall be made under this policy for any explosion or loss caused by the burning of the building or steamer containing the boiler or boilers, engines, elevators, or machinery, or for any loss or damage by fire resulting from any cause whatever."

It must be admitted that stronger or more comprehensive language could not have been chosen to show that there was no indemnity against loss by fire contemplated. The meaning and force of it is sought to be broken by counsel for defendant in error by saying that it is inconsistent with the main provision for insurance in the body of the policy, and therefore should not be given effect,—in analogy to a principle in the law of real estate that, when a condition in a deed is inconsistent with the grant itself, it is void. But it seems evident that this principle can have no application to this case. In this case, no doubt, the true principle of construction is that all parts of the policy should be considered and construed together in order to arrive at the true intent of the parties; but, aside from this, we can discover no inconsistency between the provisions in the body of the policy and this condition. The policy nowhere professes to insure against loss by fire. The company is a boiler insurance company, and it undertakes in the policy to insure against "explosion and accident," and there is a condition on the back of the policy which limits the term "'explosion' to mean only a sudden and substantial rupture" of the shell or flues of the boiler or boilers, caused by the action of steam. It is not contended that this condition is void, though, no doubt, it qualifies and limits materially the language of the provision in the body of the policy. Insurance against fire is perhaps the most common and important insurance indemnity known to business. It would be very unusual in a fire insurance policy if nothing were said in the indemnity clause of the policy directly and in terms about insurance against loss by fire. We suppose it might be possible to draw such a policy, but it would be, in a business way, very unusual. Now, it is manifest there is no provision in terms in this policy for insurance against fire. If it is there at all, it must rest upon inference and construction, which ought not to be in an insurance so common as that against fire. It was, no doubt, to guard against any such possible construction or inference that the express provision was put in against indemnity for "any loss or damage by fire resulting from any cause whatever." There is no inconsistency between this provision and the provision for insurance in the body of the policy, which, without this, should not be construed as an indemnity against fire. The putting in of this clause leaves little room for construction. Its import is too obvious and necessary. If the term "accident," as used in the policy, means accidents generally, those produced from outside causes as well as those resulting from defective machinery, still the accident of fire must be excepted by force of this condition of the policy. That the disaster which resulted in the destruction of the buildings and machinery was caused by fire is apparent from the evidence, and from the finding of facts by the court. The controlling, efficient cause was fire. The court finds that "the disaster was caused by the ignition of the inflammable gas or mill dust in the drying house." And the evidence fully supports this finding. The record shows that there was a fire in the kiln on

three separate days. On the first day it had extended to the top of the kiln. It was a dangerous fire, and caused the attendants much trouble. When they thought they had succeeded in putting it out, they would find it suddenly starting up again. The finding of the court shows that "the blaze was a clear, bright flame, and was quite extensive, and burned strongly, being from six to eight inches high, and extending under the pipes to the back of the kiln. * * *" Dr. Behr, a chemist, and the superintendent of the refinery, says:

"We were always afraid of fire. As it happened, the dust caught fire, and the explanation of that is that such fine powders, if you powder it up fine enough, have the property of catching fire."

And he further says:

"Hobbold came to me, and said, 'There is a fire in the dextrine kiln.' Now, generally, the first impulse when there is a fire is to put it out. I said, 'Let's go there and put it out before it catches any further.' * * * Before I had a chance to collect my mind or close the door [of the kiln] I got a kind of a flash, and that is all I know. * * * Such dust will catch fire, and burn like coal gas and air. * * * It takes very little to make this mixture of starch and air combustible. Just what happened as it caught fire I do not know. * * * After having had the experience, I can say now that I could have prevented the explosion if I hadn't opened the kiln. If the fire could have been confined to the kiln only, the damage would have been slight: there would not have been any explosion."

Again, he says:

"It [the blaze] was so long and big that it could not have been created by a piece of wood. A piece of wood would have no business there."

Witness Hobbold, one of the attendants, testifies:

"After we opened the door there was a flame. The fire reached to a flame between the time when I went up to the office and came down again on the bottom of the kiln. * * * The fire was in the rear; * * * in the rear of the steam pipes, and underneath; underneath the steam pipes on the floor; on the foundation. The crust that was packed tight from that 26th day that night was what was burning. The water got on there, and made a regular you may say, pancake, and the heat dried it, and the crust got tight to the railing there, and laid underneath it there, and fire burned that crust. There was no dirt burning; only these crusts were burning,—the paste made out of the dextrine and the water. When I got out the first row, we moved up the second, and Dr. Behr took hold of the hose then, and got into the second, and probably, or so it seems to me, he must have got a little too high or too low, and some water got on top, and threw some of this dextrine off, and raised a dust, and that stuff struck the fire below, and that brought the explosion. * * * On the night of the 25th I was called at 11 o'clock. I was told the fire was there at 9 o'clock. I believe the engines and firemen put the fire out on the night of the 25th. On the morning of the 26th there was one crust that was burning. I saw that crust. I took a pail,—a tin pail,—and got water on that crust, and drowned it. * * * The pans were taken out on the morning of the 27th. They were not spoiled. It was cooked all right, but the fire had been all over the kiln until [as far as] the top; and on top we found trays that was burnt, and there was nothing left but a little bit of coals,—what you get after you burn paper,—on the top of the kiln."

Again, Dr. Behr testifies:

"When I opened the door there was not a sudden burst of flame. The flame was like a hard coal fire burning in a furnace: just a little flickering flame; not like charcoal. It was a clear flame. Two days before there was a fire there, and we certainly thought that the water would do away with all

tendency to further catching fire. It was just like a paste, and I got it all over my boots. That was cleaned out. The accumulation that was left was very little, but it was enough to catch fire. It must have come from the spilling out of the pans as they were shoved in there. The starch is put in there in a dry shape as powder. It does not become hard when heated. It can be changed into a dextrine at a high temperature, like they do it in Europe, and quickly changed; or by the use of low temperature, or by steam, like we do it, and take more time. After having had the experience, I can say now I could have prevented the explosion if I hadn't opened the kiln. If the fire could have been confined to the kiln only, the damage would have been slight. There would not have been any explosion. Hobbold notified me of the fire about six o'clock on the twenty-seventh of March, and I came down to the dextrine room, and had the kilns opened. There was a fire underneath, five or six or eight inches high, and underneath the coils of the pipes. Hobbold had played the stream from the extinguisher possibly about half a minute or so before I became unconscious. When I first noticed the fire under the pipes in the kiln, I directed Hobbold to put the water on the fire with the Babcock fire extinguisher. We had had an experience two days before in putting out a fire in that manner. I was not there. It was in the night, and they had put it out readily. I thought the easiest way to put it out was with the Babcock extinguisher. The explosion in the dextrine kiln originated from the fire. It was not sufficient to cause the destruction; but it was communicated then to the room above, and caused an explosion and destruction of the building. There must have been a second explosion in the rooms up stairs."

From the testimony and the findings it seems quite clear that the proximate and legal cause of the disaster was this persistent and dangerous fire, originating in the kilns, and progressing to a final destruction of the buildings, and that the explosion was a consequence of the fire, marking a stage in its progress. After the explosion the testimony shows that the fire continued, destroying the debris of the building; so that the entire result is traceable to the fire in the kilns as the efficient cause. There is nothing more common, when a fire is once in progress, than for explosions to take place as a result of the fire, and as a part of it. These explosions may add very materially to the destruction of property, but it would be to lose sight of a plain principle to attribute the loss in such cases to the explosion as the proximate cause. The explosion may be the proximate cause in the literal sense of its being the next, nearest, or immediate cause, but not in the legal sense of being the real and efficient cause, where there is a concatenation of causes and effects, each successive effect becoming in turn a cause. The rule applicable here is the one laid down by Mr. Justice Strong in Insurance Co. v. Boon, 95 U. S. 117. "The proximate cause is the efficient cause,—the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster." Here the fire was the cause of the explosion, which played its full share in producing the wreck, the fire again getting in its work after the explosion took place. As was said by Mr. Justice Cushing in the leading case of Scripture v. Insurance Co., 10 Cush. 356:

"If, then, a combustible substance in the process of combustion produces explosion also, it is not easy to perceive why, of the two diverse but concurrent results of the combustion, the one should be ascribed to fire any less than the other. The plain fact here is the application of fire to a substance susceptible of ignition, the consequent ignition of that substance, and immediate damage to the premises thereby. It is no sufficient answer to say that some of the phenomena produced are in the form of explosion. All the effects, whatever they may be in form, are the natural results of the combustion of a combustible substance; and, as the combustion is the action of fire, this must be held to be the proximate and legal cause of all the damage done to the premises of the plaintiff."

Nor is it any answer to say that the explosion would not have happened if the fire had been better managed, and the door of the kiln been kept closed. The attendants, perhaps, did not choose the best and safest method of extinguishing the flames, but they acted in good faith, and thought they were doing the best that could be done. Suppose a fire had caught in any other place inside the building, and in trying to extinguish it an attendant had, in the excitement of the moment, caught up a' bucket of crude petroleum, supposing it to be water, and had cast the contents upon the flames, and an explosion had resulted, destroying the building, there could be no question in such a case but that a fire insurance company would be liable as for a loss by fire, although it might be reasoned that, but for such mismanagement, the fire might have been subdued. This case is not different in principle from the one supposed. In either the controlling cause of the loss is the fire. If the explosion was the immediate cause of the greater damage, the fire was the cause of the explosion, the cause of the cause. It will frequently happen in the case of a fire that the greater part of the damage is caused by water applied in efforts to extinguish the flames; yet it has always been held that the legal and efficient cause of such damage is the fire, and insurers against fire are held for it. The rule laid down by the court in Scripture v. Insurance Co. is the one that has been generally followed, and is applicable here, namely:

"That where the effects produced are the immediate results of the action of a burning substance in contact with a building, it is immaterial whether these results manifest themselves in the form of combustion or explosion or both combined. In either case the damage occurring is by the action of fire,, and covered by the ordinary terms of a policy against loss by fire."

This principle has been frequently, and we think generally, acted upon since. It governed in the case of Washburn v. Insurance Co., 2 Fed. Rep. 304, decided by Judge Swing. To the same effect are Washburn v. Insurance Co., Id. 633, 2 Flip. 664, decided by Mr. Justice Swayne of the supreme court; Washburn v. Artisans' Ins. Co., Same v. Pennsylvania Ins. Co., (Cir. Ct. W. D. Pa.) 9 Pittsb. Leg. J. (N. S.) 55. These decisions, though made in the circuit courts, have never been overruled, and are sound in principle. The same principle is recognized and adopted by the best text writers on the subject. Philips, in his work on Insurance, (section 1097,) says "the maxim 'causa proxima spectatur,'" affords no help in these cases, but in fact is fallacious; for, if two causes conspire, and one

must be chosen, the more scientific inquiry seems to be whether one is not the efficient cause, and the other merely instrumental or merely incidental, and not which is nearest in place or time to the consummation of the catastrophe. And at section 1132, he says: "In case of the occurrence of different causes to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or is not in activity at the consummation of the disaster." The rule is well stated by the supreme court of Michigan in Brady v. Insurance Co., 11 Mich. 425. They say:

"This contract of insurance is one of indemnity against loss by fire, and the whole loss of which the fire is the actual cause is within its terms to the extent of the indemnity promised. Much is said by judges of the proximate and remote cause of the loss, and the distinction was very elaborately discussed by counsel in the present case; but, after careful consideration, I must confess that to my mind the word 'proximate' is unfortunately used, and serves often to mislead the inquirer, and to produce misapprehension of the real rule of law. That which is the actual cause of the loss, whether operating directly or by putting intervening agencies—the operation of which could not be reasonably avoided—in motion, by which the loss is produced, is the cause to which such loss should be attributed. If, in the effort to extinguish fire, property is damaged or destroyed by water, the water may be said to be the proximate cause of the injury or destruction; yet in no just sense can it be said to be the actual cause. That was the fire. The fair and reasonable interpretation of a policy of insurance against loss by fire will include within the obligation of the insurer every loss which necessarily follows from the occurrence of the fire, to the amount of the actual injury to the subject of the risk, whenever that injury arises directly and immediately from the peril, or necessarily from incidental and surrounding circumstances, the operation and influence of which could not be avoided."

In Insurance Co. v. Foote, 22 Ohio St. 340, the same principle is carried out. There the action was upon a fire insurance policy which provided that the company should not be liable for any loss or damage occasioned by or resulting from any explosion whatever, whether of steam, gunpowder, camphene, coal oil, etc. It appeared that an explosive mixture of whisky vapor and atmosphere had come in contact with the flame of a gas jet, from which it ignited, and immediately exploded, whereby a fire was set in motion, which destroyed the property. It was justly held that the explosion was the cause of the loss, and that the company was not liable. The court say on page 349 that:

"It is true that the explosion was caused by a burning gas jet, but that was not such a fire, as contemplated by the parties, as the peril insured against. The gas jet, though burning, was not a destructive force, against the immediate effects of which the policy was intended as a protection, although it was a possible means of putting such destructive force in motion; it was no more the peril insured against than a friction match in the pocket of an incendiary."

This was but carrying out the principle adopted in all the cases that we must look to the efficient or proximate cause to determine the responsibility for the disaster. And on page 351 the court say:

"That a loss other than by combustion, resulting from an explosion, when the explosion itself is caused by a destructive fire already in progress, comes within the general risk of a policy against fire only, is a doctrine not only reasonable in itself, but is sustained by authority."

See, also, Waters v. Insurance Co., 11 Pet. 225, opinion by Judge Story; Scripture v. Insurance Co., 10 Cush. 357; Millaudon v. Insurance Co., 4 La. Ann. 15; Insurance Co. v. Corlies, 21 Wend. 367.

The conclusion we have reached is that the policy sued upon contains no indemnity against loss by fire, and that the damage to the premises of the defendant in error was caused by fire, and that the loss was properly a fire loss.    Judgment reversed, and the cause remanded, with directions to the circuit court to enter judgment of no cause of action, and for costs in favor of the plaintiff in error.

Mr. Justice HARLAN is not present, but he participated in the hearing and the decision of this case, and concurs in this opinion.